RANCE FULTZ, *et al.*

*v.*

B. H. CONNELLY, *et al.*

(No. 10593)

Submitted February 3, 1954. Decided March 16, 1954.

*Maxwell W. Flesher, H. L. Ducker, Paul W. McCreight,* for appellant.

*George S. Wallace, George S. Wallace, Jr.,* for appellees

BROWNING, JUDGE:

Rance Fultz and Ruth Fultz, his wife, hereinafter referred to as plaintiffs, instituted this suit in chancery against the defendants, B. H. Connelly and Kathryn Trowbridge, praying for the specific performance of a contract for the sale of a farm, in which each defendant owned

an undivided one-half interest. The Circuit Court of Cabell County found in favor of the plaintiffs as against Kathryn Trowbridge, and, on March 27, 1953, entered a decree ordering her to convey her interest in the property to the plaintiffs upon the payment to her of one-half of the contract price, less one-half of the outstanding indebtedness against the property, to which decree this Court granted this appeal on May 25, 1953.

The record shows that on June 21, 1951, Kathryn Trowbridge Connelly was granted a divorce from B. H. Connelly and restored to her maiden name. The divorce decree also ratified and confirmed a property settlement, previously entered into between the parties, which provided in part as follows: "* * * That they will sell the farm property hereinbefore referred to for a sum of not less than Forty Thousand ($40,000.00) Dollars, and after the payment of the outstanding mortgage indebtedness thereon and the expenses of sale, the net proceeds shall be divided equally between them; * * *."

Subsequently, on July 14, 1951, the defendant, B. H. Connelly, was approached by S. H. Lawrence, an employee of the Pancake Realty Company, who desired to list the property for sale, and informed Lawrence that "he couldn't give an option because they both were in partners on it, and I would have to go see her, and if she was willing to give me an option on it he would be." Lawrence then testified that he saw Miss Trowbridge and informed her of his conversation with Connelly; that Miss Trowbridge then signed; and that he returned to Connelly and Connelly signed. This "option" constituted the Pancake Realty Company the sole and exclusive agent of the defendant, for a period of thirty days, to advertise and sell the property for the sum of $40,000.00, or any less sum defendants would accept, and provided for the payment of a commission of 5%. The manner in which the signatures to this "option" were obtained is uncontradicted.

On or before August 13, 1951, the expiration day of the first "option", another thirty day "option" was signed by

Miss Trowbridge, which is the basis for the present suit. The evidence in regard to the circumstances under which Miss Trowbridge signed this "option" is conflicting. Lawrence testifies that he made the "same go-around again"; that Connelly refused to sign; that he then went to Miss Trowbridge and informed her that he hadn't been able to get it signed "down there"; that Miss Trowbridge then signed; and that he returned to Connelly, who again refused to sign. Paul Pancake, of the Pancake Realty Company, testifies to much the same effect, though there is some discrepancy between the testimony of Lawrence and Pancake. Miss Trowbridge testified that the circumstances were the same as in the first instance, that is, that she was again informed that Connelly would agree if she would, and that she then signed.

Later, on September 8, 1951, the plaintiffs entered into a contract denominated "Purchase Agreement" with the Pancake Realty Company providing for the sale of the property, subject to the owners approval, for the sum of $40,000.00, $12,000.00 of which was payable on delivery of the deed, and the balance by assuming the indebtedness against ·the property.

There is some contradiction as to whether this was the same "Purchase Agreement" originally presented to Miss Trowbridge, or whether any sufficient tender in accordance therewith was made, but, in any event, both Miss Trowbridge and Mr. Connelly refused to accept and honor it.

It is not contended by the plaintiffs that there were any direct negotiations between them and the Connellys, relative to the contract of September 8, and they rely wholly for its validity upon the authority of the Pancake Realty Company to act as agent for the appellant. The plaintiffs do not deny either that they were fully aware of the joint ownership of the property in the appellant and her former husband Connelly, or of the property settlement agreement entered into between Connelly and his wife prior to their divorce, and which was approved in the divorce

decree. Neither do they allege or state in their testimony that there was at any time any discussion between the Pancake Realty Company and the appellant relative to the former's authority under the so-called option to sell the appellant's one-half undivided interest in the property. The trial chancellor, however, found that the agency agreement between appellant and the Pancake Realty Company as a matter of law gave the agent the authority to make a valid contract with the plaintiffs, binding the appellant, and that there was no fraud or misrepresentation in the execution of the option by the appellant.

In 3 M. J., Brokers, § 12, we find this statement:

> "The business of a broker generally is only to find a purchaser who is willing to buy the land upon the terms fixed by the owner. He has no authority to bind his principal by signing a contract of sale. A sale of real estate involves the adjustment of many matters besides fixing the price. The delivery of the possession has to be settled, generally, the title to be examined, and the conveyance with its covenant to be agreed upon and executed by the owner, all of which require conference and time for their completion. They are for the determination of the owner, and do not pertain to the duties, and are not within the authority of a real estate agent. For obvious reasons, therefore, the law wisely withholds from him any implied authority to sign a contract of sale on behalf of his principal. Nor can he materially change the terms of the sale fixed by the principal without his consent.

> "Authority given to 'list' property, and to 'place property on commission' confers no power to sign a contract of sale. * * *"

The annotations to this section cite no West Virginia case, but several Virginia cases. It is not necessary to discuss further the questions raised relative to the signing of the option by the appellant, whether such alleged agency thereby created gave the Pancake Realty Company the authority to execute the agreement with the plaintiffs, or the other questions presented in the appeal of this case,

inasmuch as they are rendered moot by the ruling of the Court upon another point.

The agreement executed by the appellant and the Pancake Realty Company, on August 13, 1951, is upon a printed form, and besides the general provisions applicable to all clients of the realty company, it provides, with the exception of a complete description of the property, only the following:

"I will pay said agent 5 percent commission upon the price of $40,000.00 or any less price I may accept.

"Terms: $Cash above present loan.

"1st Mortgage Mrs. M. E. Mossman  App. $26,000. $192.00 per Mo. 5 per cent."

The purchase agreement of September 8 begins with this statement: "Received of Ruth Fultz. . . . Two Thousand and no/100 Dollars ($2,000.00) as earnest money and part of the purchase price of the following described premises: * * *.", and further provides that $12,000.00 in cash shall be paid upon delivery of the deed, and the balance by assuming Mrs. M. E. Mossman's first deed of trust on the property "in approximate amount of $26,000.00 payable at $192.00 per month—5 per cent interest." By this language, it is apparent that the plaintiffs and the Pancake Realty Company contemplated the joining of B. H. Connelly, former husband of the appellant, in the agreement, inasmuch as the indebtedness represented by the deed of trust was the total amount against the property, and not one-half thereof, or the appellant's part. There is no provision made for relieving appellant of her obligation as co-signer with her husband of the note payable to Mrs. Mossman which was secured by the deed of trust. She was thereby obligated to pay the entire amount of the indebtedness, not one-half of it. Furthermore, the property settlement agreement provides: "* * * It is agreed and understood that the equities of each party are based upon the net value of the property as of this date, and the wife agrees that on all subsequent payments made by the husband prior to the sale of said property, that the one-

half part thereof shall be chargeable to her one-half interest in said property." The agreement further states: "It is understood and agreed that all screens, window shades, linoleum, flowers, trees, shrubbery, and awnings, if any, are to remain with the property." There is a further provision that the sale is to be completed within sixty days, but as to all of these details, there is no explanation as to how the Pancake Realty Company, as agent, or the appellant, as principal, if she was, were to carry out these provisions in view of the ownership of B. H. Connelly of a one-half undivided interest in the property. These two vital statements were contained in the agreement: First: "This sale is made by Pancake Realty Company as agent for the owner of the above described premises and subject to the owner's approval. * * *" and Two: "If the owner does not approve this sale or cannot convey the property as herein provided, the earnest money shall be returned to the purchaser, * * *." The executory clause is as follows:

"WITNESS the following signatures and seals.

"PANCAKE REALTY COMPANY, Agent

"By (s) PAUL C. PANCAKE, President

"(s) RANCE FULTZ        Purchaser

"(s) RUTH T. FULTZ       Purchaser

"Approved and accepted:

"_____Owner

"_____Owner"

As heretofore stated, neither of the owners of the property executed the agreement, and both repudiated it.

This Court held in *Hoon* v. *Hyman,* 87 W. Va. 659, 105 S. E. 925, that: "Where, after negotiations, parties reduce their understandings to writing, which writing provides for the signatures of all of them thereto, and further for the approval of the contract by a third party, upon whose behalf one of the parties is acting as agent, and there is

nothing to show that they intended the contract to be complete unless such writing was signed by all of such parties, and the subject-matter is such as is ordinarily the subject of a contract in writing, as in this case the sale of real estate, and one of the parties does not sign said contract, and the principal whose acceptance thereof is provided for does not accept the same, it will be held that there was no completed contract binding upon the parties."

In 12 C. J. S., Brokers, § 129 (c), we find this statement: "If a contract negotiated by a broker is made subject to confirmation or approval by the principal, it is not binding on the latter until he confirms or approves it."

In discussing the equitable remedy of specific performance, the following is stated in 17 M. J., Specific Performance, § 2: "Specific performance is an encroachment on the common law introduced for the benefit of a person aggrieved by breach of an agreement. The most striking feature of the remedy of specific performance is that it is not regarded as a strict right which the court is bound to enforce, but as an extraordinary act of grace on the part of the court, to be granted only where the plaintiff makes out his case fully, and there is not only no actual fraud or mistake, but there is no hardship or oppression, even though these do not amount to legal or equitable wrong."

This Court holds, for the reasons herein stated, that the decree of the Circuit Court of Cabell County, requiring the appellant to specifically perform the terms and conditions of the agreement, dated September 8, 1951, executed by the plaintiffs and the Pancake Realty Company, was clearly wrong. It follows, therefore, that the ruling of the trial chancellor must be reversed and the bill dismissed.

*Reversed and bill dismissed.*